770 F.Supp. 1393 (1991)
The METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff,
v.
Sophia L. BARNES and Lisa M. Barnes, Defendants.
Bessie K. BARNES, Defendant/Third Party Plaintiff,
v.
The MONSANTO COMPANY, Third Party Defendant.
No. 90-201-C-5.
United States District Court, E.D. Missouri, E.D.
July 31, 1991.
Stanley Walch, Roman P. Wuller, Thompson & Mitchell, St. Louis, Mo., for Metropolitan Life Ins. Co.
Lena A. Conley, St. Louis, Mo., for Sophia L. and Lisa M. Barnes.
James R. Hanlin, Clayton, Mo., for Bessie K. Barnes.
Richard J. Pautler, William S. Port, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for Monsanto Co.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff The Metropolitan Life Insurance Company ("Metropolitan") issued Group Policy No. 11100 (the "Policy") to third party defendant The Monsanto Company ("Monsanto"). The Policy provided for the payment of life insurance benefits to the designated beneficiary of an eligible participating employee upon the death of that employee. Latham Barnes, who was employed by Monsanto at its W.F. Queeny plant, was insured under the Policy. After his death, Latham's two daughters, Sophia Barnes and Lisa Barnes, and his wife, Bessie *1394 Barnes, made claims to the life insurance benefits. After receiving the conflicting claims, Metropolitan filed a complaint in interpleader pursuant to Fed.R.Civ.P. 22 against defendants Sophia, Lisa, and Bessie.
Metropolitan deposited with the Registry of the Court the life insurance benefits payable to Latham's beneficiary under the Policy, and was dismissed with prejudice from this action. On February 28, 1990 Bessie filed a third party complaint against Monsanto for breach of contract and breach of fiduciary duty. On March 7, 1991 Bessie dismissed her third party complaint against Monsanto. Therefore, the only remaining claim before the Court is the determination of the proper beneficiary of Latham's life insurance benefits. This action was tried before the Court on March 19, March 20, and May 2, 1991. The Court, having considered the pleadings, testimony of witnesses, and documents admitted into evidence hereby makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

I. Findings of Fact

On May 29, 1976 Latham and Bessie were married. At the time of their marriage Latham and Bessie both had children from previous marriages. Latham had two daughters, Sophia and Lisa, by his first wife Addie Barnes. At the time of Latham's and Bessie's marriage Sophia was twelve years old and Lisa was six years old. Bessie had one son, Bruce Germany, by her first husband and twin sons, Sherman Hawkins and Sherwin Hawkins, by her second husband. Sophia and Lisa lived with their mother but visited and spoke with Latham frequently. From 1976 to 1982 Sophia's and Lisa's relationship with Bessie was cordial. In 1982 the relationship between Bessie and her stepdaughters began to deteriorate.[1] After 1982 Sophia's and Lisa's contact with their father became increasingly more infrequent. By 1985 the contact between Latham and his daughters dwindled to an occasional telephone call and a rare visit. Sophia and Lisa assert that they maintained only minimal contact with their father because Bessie made them feel unwelcome during visits, and interrogated them when they attempted to contact Latham by telephone. Bessie claims that Sophia and Lisa were always welcome in her home, and that she never intercepted or interfered with telephone calls between Latham and his daughters.
The marriage of Latham and Bessie was turbulent. Bessie testified that Latham drank three half pints of whiskey and six cans of beer per day.[2] In 1980 Latham began to experience serious health problems caused by alcohol consumption and smoking. Latham was hospitalized on numerous occasions from 1980 to his death for congestive heart failure, caused by alcohol abuse, and emphysema.
Latham and Bessie argued over financial matters.[3] On several occasions Latham removed Bessie's name from their joint checking account to deprive Bessie of access to family funds. Later, Latham would change his mind and place Bessie's name back on the account. On occasion Bessie would pick up Latham's paycheck from Monsanto without his permission. Latham would become enraged when he would attempt to pick up his paycheck and it had already been given to Bessie. Between February, 1981 and April, 1981 Bessie picked up Latham's check approximately *1395 three times without his permission. Elvester Young, the accounts payable supervisor and paymaster at Monsanto's W.F. Queeny plant, testified that Latham's and Bessie's disputes over financial matters prompted a change in policy at that plant. In mid-1981 the W.F. Queeny plant adopted a policy that the spouse of a Monsanto employee must have the Monsanto employee write a note or phone the payroll department before the spouse could pick up the employee's paycheck.[4]
Bettye Avery has been Monsanto's benefits representative at the W.F. Queeny plant since May, 1980. During the course of her position as benefits representative Bettye became familiar with Latham and Bessie. Because Latham's health was poor, Latham often visited Bettye concerning his medical benefits. Latham also involved Bettye in a dispute between Latham and Bessie over the medical coverage of Sophia and Lisa. Latham asked Bettye to prevent Bessie from interfering with medical benefits paid for the treatment of Sophia and Lisa.
Bettye testified that Latham visited her in 1985 in order to change the beneficiary of his life insurance benefits. On August 20, 1985 Latham executed, in Bettye's presence, a "special beneficiary designation" form on which he designated Sophia and Lisa as his primary beneficiaries and Tom Barnes, Latham's brother, as contingent beneficiary of his life insurance benefits.[5] After August 20, 1985 Latham never contacted Bettye concerning a change of beneficiary form.
In 1987 Bessie grew concerned that Latham had replaced her as beneficiary of his life insurance benefits. Bessie called Bettye to inquire about the beneficiary designation. Bettye refused to release any information. In late 1987 or early 1988 Bessie visited Bettye in order to obtain a change of beneficiary form. Bettye informed Bessie that she could only give a change of beneficiary form to Latham. Bessie telephoned Monsanto's Creve Coeur office and talked to an unidentified Monsanto employee concerning a change of beneficiary form. Later, Bessie received a change of beneficiary form in the mail. Although the envelope was addressed to Bessie, Latham opened it and placed the change of beneficiary form in a dresser drawer.
On May 8, 1989 Latham was hospitalized at DePaul Hospital for shortness of breath and other ailments. On May 14, 1989 Latham was released from the hospital. After his release Latham was alert, lucid, and mobile. Bessie and Sherwin testified as to the following events on the afternoon of May 16, 1989. Latham called Bessie into the kitchen and showed her the change of beneficiary form that he formerly placed in his dresser drawer.[6] Latham told Bessie that he wanted to make her the beneficiary of his life insurance benefits because he was concerned that Bessie would not have sufficient funds with which to live after his death. Latham had Bessie complete the change of beneficiary form because "he did not feel like writing." After Bessie completed the form that designated herself as beneficiary, Latham called Sherwin into the kitchen to witness his signature. Latham began to sign the form "L. Barnes" but crossed out his first initial and signed the form "Latham Barnes".[7] Latham gave the *1396 executed change of beneficiary form to Bessie and told her: "Take this form to Bettye Avery and tell her I told you to bring this." On May 25, 1989 Latham was readmitted to DePaul Hospital because he had difficulty breathing. Latham remained at DePaul Hospital until his death on June 20, 1989. Latham was alert until approximately one week before his death.
On May 31, 1989 Sherwin drove Bessie to Monsanto to see Bettye.[8] The W.F. Queeny plant visitor register shows that Bessie and Sherwin checked in at 9:35 a.m. and checked out at 9:55 a.m. on that day. The versions of Bettye and Bessie as to what transpired during that visit are substantially different. Bessie testified that she presented the change of beneficiary form to Bettye but Bettye refused to accept it. Bettye said she had to hear from Latham before she would accept the form. Bessie told Bettye that Latham was at DePaul Hospital and she could call or visit him there.[9] Bettye testified that Bessie visited her in order to obtain a change of beneficiary form. Bettye told Bessie that she could not give her a form or reveal the identity of the beneficiaries. Bessie then stated: "Give me a change of beneficiary form and I won't tell anyone where I got it." Bettye was upset by Bessie's offer and refused to cooperate.
From May 16, 1989 to the time of his death Latham did not telephone or otherwise contact Bettye Avery to inform her of his desire to change the beneficiary on this life insurance policy.
Sophia and Lisa visited Latham during his last illness. Sophia flew in from California to see her father; Lisa visited her father from her college residence in Greenville, Illinois. During Sophia's visit Latham could not talk, and consequently did not discuss his life insurance policy with her.[10] Lisa visited Latham during his hospital stay from May 8, 1989 to May 14, 1989. During this stay Latham told her that he wanted his daughters to have his life insurance benefits. After Latham's death Sophia and Lisa filed claims dated August 2, 1989 for his insurance benefits.
Annie Harris, Nettie Betts, and Sherman Hawkins testified on behalf of Bessie. Annie is a friend of Bessie's who lived four blocks from Bessie and Latham. On May 15, 1989 Annie visited Bessie. During the visit Annie spoke with Latham in the kitchen.[11] Latham informed Annie that his daughters did not care for him, and that he was going to make Bessie his beneficiary because he wanted her to have his life insurance benefits.
Nettie Betts is a friend of Bessie's and a distant cousin of Latham's. Nettie visited Bessie and Latham in their house. During these visits Latham would occasionally speak of his life insurance policy. Latham told Nettie that he grew apart from his daughters as they got older. Nettie visited Latham after he was released from the hospital on May 14, 1989. During this visit Latham told her that Bessie, and not his daughters, was the beneficiary of his life insurance benefits.
Sherman Hawkins is Bessie's son. Sherman visited Latham in the hospital on May 12, 1989. Sherman testified that during this visit Latham informed him that he planned to make Bessie his beneficiary.
Tom Barnes, who is Latham's brother, testified on behalf of Sophia and Lisa. Tom testified that he spoke with Latham before Latham went to the hospital in May, 1989.[12] Latham told him that Bessie was *1397 "after him" to designate her as the beneficiary of his life insurance benefits but that Latham did not want to do it. Tom spoke with Latham on the night before Latham lapsed into the coma from which he would not regain consciousness. According to Tom, Latham's last words to him were: "I will not change my benefits."

II. Conclusions of Law

The Policy provides, in relevant part:
When you are first hired, you complete a "Life Insurance Beneficiary Designation" form to name a beneficiary. To change a beneficiary, you need to complete the same form and file with your Benefit Representative. Naming a beneficiary and keeping the designation current are important responsibilities under this plan. If circumstances warrant a change, it is your responsibility to notify your Benefit Rep that you wish to change beneficiaries and to submit the form with current beneficiaries to your Rep, To be valid and recognized legally, your beneficiary designation form must be filed with your Benefit Rep  not in a drawer at home or with Metropolitan.
It is clear that Latham did not change his beneficiary in accordance with the provisions of the Policy because the change of beneficiary form was never filed with Latham's benefits representative. However, Latham's failure to comply with the provisions of the policy is not dispositive. The terms regulating the manner in which a beneficiary can be changed are primarily for the benefit of insurers, to protect them against multiple liability from conflicting claimants. Provident Life and Accident Ins. Co. v. Buerge, 703 S.W.2d 590, 593 (Mo.App.1986) (citing Bell v. Garcia, 639 S.W.2d 185, 190 (Mo.App.1982)). Because the provisions regulating the change of beneficiary are for the benefit of insurers, the insurer can waive strict compliance with such terms. Id. (citing Blue v. Supreme Camp of American Woodmen, 135 S.W.2d 373, 376 (Mo.App.1940)). In the instant matter, Metropolitan filed a complaint in interpleader and paid the proceeds of the policy into the Registry of the Court. By doing so, Metropolitan waived strict compliance with the provisions of the policy. Id. (citing John Hancock Mutual Life Insurance Co. v. Dawson, 278 S.W.2d 57, 61 (Mo.App.1955)).
Missouri courts recognize the equitable doctrine of substantial compliance to carry out the intent of the insured when the insured has not strictly complied with the method provided by the insurance policy to change the beneficiary. Anglen v. Heimburger, 803 S.W.2d 109, 112 (Mo.App. 1990). The doctrine of substantial compliance simply carries out the intent of the insured. Capitol Life Ins. Co. v. Porter, 719 S.W.2d 908, 910 (Mo.App.1986). The insured's intention, however, must be established beyond question; and the insured must have done everything possible under the circumstances to effectuate his intent. Id. If the insured has done all within his power to exercise his right to change the beneficiary, the irregular or incomplete change is effective as against the original beneficiary. Id.
The test for substantial compliance requires the Court to find both of two factors: (1) intent to change beneficiary established beyond question, and (2) insured has done everything possible under circumstances. However, a review of Missouri case law reveals that the courts will relax the second factor if there is clear evidence of the insured's intention. In Anglen v. Heimburger, 803 S.W.2d 109 (Mo. App.1990) (Anglen), the decedent/insured married in 1981 and subsequently named her spouse as beneficiary of her life insurance and pension benefits. In 1985 the decedent and her spouse separated; the marriage was dissolved in 1986. Shortly after the separation the decedent was diagnosed with cancer. Throughout decedent's illness she relied on her mother for financial and moral support.
At the time of the separation the decedent requested a change of beneficiary form. The insured later told her mother, her attorney, and her close friends that she had made her mother the beneficiary of her benefits. Decedent, however, never mailed the change of beneficiary form. In fact, *1398 the change of beneficiary form was never located after the decedent's death. Despite the lack of a change of beneficiary form, the Anglen court found clear evidence of the decedent's intention to rid her exspouse from her life, and awarded the life insurance benefits to decedent's mother.
In Capitol Life Insurance Co. v. Porter, 719 S.W.2d 908 (Mo.App.1986) ("Porter"), the insured/decedent named his wife as beneficiary. After the decedent and his wife separated, decedent executed a change of beneficiary form that designated his mother as beneficiary. Decedent told his mother and a witness that he removed his wife as beneficiary because of the pending dissolution action. The decedent, however, never mailed the change of beneficiary form. Decedent's parents, and not his wife, cared for him during his last illness. The Porter court awarded the life insurance benefits to decedent's mother.
In both Anglen and Porter the permanent separation of the decedent and his/her spouse suggested that the decedent intended to remove the spouse as a beneficiary on the life insurance policy. The decedents also made statements that their parents/caregivers should receive the benefits. Neither decedent, however, did all that was possible under the circumstances in order to change the beneficiary on the form. Both decedents were alert and conscious at the time they sought to change the beneficiary. Both decedents requested change of beneficiary forms but neglected to forward them to their employer or insurer. The decedent in Porter may never have even executed a change of beneficiary form. Therefore, the rule in Missouri is that a court may invoke its equitable powers to change the beneficiary of a life insurance policy if the intention of the insured is established beyond question.
In the instant matter the Court finds that Bessie has not established Latham's intent to change beneficiaries beyond question. Bessie presented the Court with the following evidence concerning Latham's intention to make her the beneficiary of his life insurance benefits: first, Bessie and her son Sherwin testified that Latham executed the change of beneficiary form in their presence; second, Bessie's friends Annie Harris and Nettie Betts, and Bessie's son Sherman testified that Latham told them that he was going to make Bessie his beneficiary or already had made Bessie his beneficiary.
The Court concludes that under the facts of this matter Latham's alleged execution of the change of beneficiary form and alleged statements to friends and relatives of Bessie are insufficient to establish his intention beyond question. The Court's decision rests upon one gaping hole in the testimony of Bessie and her witnesses. Although Latham was alert from May 16, 1989, the date on which he executed the change of beneficiary form, until approximately one week before his death on June 20, 1989, Latham never called Bettye Avery to inform her of his intent.[13]
Bessie testified that Latham directed her to "Take this [change of beneficiary] form to Bettye Avery and tell her I told you to bring this." Latham should have known that this arrangement would not be acceptable to Bettye. Bettye was aware of the disputes between Latham and Bessie concerning Latham's paycheck and that Bessie occasionally acted without Latham's permission. Bettye was also aware of the friction between Bessie and Latham's daughters, and that Latham's daughters had been designated beneficiaries of the benefits in 1985. Under these circumstances a telephone call from Latham prior to Bessie's visit was essential for Bettye to accept and process the change of beneficiary form.
*1399 After Bettye refused to accept the form with the statement "I cannot accept it until I hear from Latham", Latham still did not call Bettye to inform her of his intent. Bessie visited Latham in the hospital during Latham's last illness. Bessie certainly would have had told Latham about her visit with Bettye. If Latham intended to change the beneficiary, he would have picked up the telephone, dialed Bettye's number, and told her to accept the change of beneficiary form from Bessie. If Latham didn't feel like dialing, Bessie would have gladly dialed for him.
The testimony of the witnesses suggests that during Latham's last illness he was obsessed with his life insurance benefits. Annie Harris, Nettie Betts, Tom Barnes, Lisa Barnes, and Bessie Barnes testified that Latham discussed his life insurance benefits with them around the time that the change of beneficiary form was allegedly executed. The Court considers it remarkable that Latham would discuss the topic with casual acquaintances but fail to contact Bettye, the one person who could give effect to his intention, to inform her of his decision.
Furthermore, unlike in Anglen and Porter the relationship between Latham and his daughters does not suggest that he wanted to remove them as beneficiaries of his life insurance benefits. Although Latham and his daughters had drifted apart in the last years of his life, there was no evidence of any rift between them akin to a marital separation or divorce. Latham never disowned his daughters or refused their calls or visits. Sophia and Lisa visited him during his last illness. Although Latham expressed regret at having grown apart from his daughters, he may have attributed the detachment to Bessie.
The equitable powers of the Court do not empower the Court to give the life insurance benefits to the party who deserves them more. Bessie, who cared for Latham during his numerous illnesses and tolerated his cruel, abusive behavior for thirteen years, certainly deserves the benefits more than the daughters who rarely saw or spoke with their father. The Court, however, cannot disregard the law which requires the Court to focus on the insured's intention. Bessie did not present the Court with any plausible explanation why Latham did not telephone Bettye at any time between May 16, 1989 and his death. Under the circumstances of this case, a telephone call to Bettye was essential to prove beyond question Latham's intent to change the beneficiary of his life insurance benefits.[14]
For the foregoing reasons the Court declines to invoke its equitable powers to change the designated beneficiaries of Latham's life insurance benefits. In the accompanying judgment the Court directs the Registry of the Court to pay out to Sophia and Lisa Barnes the proceeds of Latham's life insurance benefits and the interest accrued thereon.
NOTES
[1] Bessie traces the rift in their relationship to an incident in 1982 when Sophia refused Bessie's order to make Kool-Aid. The refusal led to a verbal and physical confrontation between Bessie, Sophia, and Latham in which Latham took Sophia's side.
[2] In 1985 Latham received treatment for his alcoholism and successfully abstained from alcohol consumption for three months. Except for this three month hiatus, the marriage of Latham and Bessie was plagued by Latham's alcohol abuse.
[3] After an argument Latham would often leave Bessie and spend the night elsewhere. Latham occasionally left Bessie for longer periods of time. Latham also grew violent when he was intoxicated, and the police were frequently called to the Barnes home for incidents of domestic violence. Bessie testified that Latham once attempted to stab her but she averted his thrust after being warned by her grandchild.
[4] Bessie testified that no problems were caused by her picking up Latham's paycheck. After observing the testimony of Elvester Young, Bettye Avery, and Bessie on this issue, and considering the stormy nature of Bessie's and Latham's relationship on the control of family funds, the Court concludes that the testimony of Elvester Young is credible.
[5] The Court is unaware of the identity of the beneficiary prior to August 29, 1985. The Court suspects that Bessie was the previous beneficiary of the life insurance benefits.
[6] Bessie testified that she had not seen the change of beneficiary form since Latham placed it in the dresser drawer.
[7] Bessie sought to have Mr. William Storer, a handwriting expert, testify concerning the authenticity of Latham Barnes' signature on the change of beneficiary form. The Court did not permit Bessie's handwriting expert to testify because the designation of the expert was untimely under Local Rule 33. Although the Court has no expertise in the analysis of handwriting, the Court compared the signature of Latham Barnes on the 1985 change of beneficiary form with that on the 1989 change of beneficiary form and observed that the two signatures appear identical.
[8] Bessie could not visit Bettye before May 31, 1989 as she underwent knee surgery in mid-May and was not permitted to travel.
[9] Bettye did not assure Bessie that she would call or visit Latham.
[10] Sophia testified that at some previous time Latham told her that she and Lisa were his beneficiaries.
[11] Bessie remained in the bedroom during this conversation.
[12] Tom Barnes did not specify whether he spoke to Latham before Latham's admission to DePaul Hospital on May 8, 1989 or May 25, 1989.
[13] The Court recognizes that Bessie is on the horns of a dilemma on the issue of Latham's mental state during the period in which the change of beneficiary form was executed. If Latham was lucid and alert at the time he signed the change of beneficiary form, he could have called Bettye Avery and notified her of his intention. If Latham was debilitated and infirm at the time he signed the change of beneficiary form, Latham's deteriorated mental state calls into question whether he was competent to sign the change of beneficiary form, or whether undue influence was exerted by Bessie in obtaining his signature.
[14] The second prong of the Court's inquiry whether Latham did everything possible under the circumstances to effectuate his intent, is not satisfied for the same reason. The circumstances required Latham to call Bettye Avery and inform her of his intent.